UNION STOCK YARDS COMPANY V. CHARLES M. CON-
OYER, ADMINISTRATOR.

FILED JUNE 27, 1894.   No. 5417.

1. **Contributory negligence** is a matter of defense, and the
burden of its proof is on the defendant.   If the plaintiff proves
his case without disclosing any contributory negligence, he will
be assumed to be free therefrom.

2. **Death by Wrongful Act:** NEGLIGENCE: EVIDENCE.  A fact
may be considered as established which may be reasonably in-
ferred from all the facts and circumstances proved in a case; and
in civil actions it is sufficient if the evidence on the whole agrees
with and supports the hypothesis which it is adduced to prove
and it is the duty of the jury to decide according to the reason-
able probability of the truth.

3. ———: ———: ———.  Evidence examined, and *held* sufficient
to warrant the submission of the questions of negligence and
proximate cause of the injury to the jury for their consideration
and to sustain the verdict rendered.

4. **Motion to Direct Verdict:** NEGLIGENCE: EVIDENCE.  The
former decision of this case, reported in 38 Neb., 488, reaffirmed.

REHEARING of case reported in 38 Neb., 488.

*Breckenridge & Breckenridge* and *L. F. Crofoot,* for
plaintiff in error.

*Mahoney, Minahan & Smyth, contra.*

HARRISON, J.

This case was heard in this court and decided.  The
opinion was filed November 28, 1893, and reported in 38
Neb., 488.  A motion for rehearing was filed and pre-
sented by th plaintiff in error, and on February 20, 1894,
the motion was sustained and a rehearing ordered upon the
one question alone, of the sufficiency of the evidence to
sustain the verdict.  The action was commenced by the

defendant in error, as administrator of the estate of William McAnnelly, deceased, to recover damages in the sum of $5,000 from the Union Stock Yards Company of South Omaha for the death of McAnnelly, which, it is alleged, was caused by, or the result of, the negligence of the company.

The stock yards company own and operate a number of railroad tracks uniting the various packing houses at South Omaha with the railways centering there. Over these tracks cars are moved from the railways to the packing houses and from the packing houses to the railways. At the time this cause of action arose there were in the employ of the stock yards company two "engine crews," so called, one employed at night, the other by day. An engine crew consisted of an engineer, fireman, two brakemen and a foreman. The deceased, William McAnnelly, was foreman of the engine crew operating during the day-time. On the 5th of February, 1890, at 8 o'clock in the morning, the stock yards company's foreman, the immediate superior to McAnnelly, directed McAnnelly to take his crew and engine, go west over the tracks of plaintiff in error to the Omaha Packing Company's establishment and bring from there a number of freight cars. He went as directed and did what was necessary to get the cars together preparatory to hauling them away. After the train was made up, and about five or ten minutes before it started east, McAnnelly was seen looking the train over,—we assume, for the purpose of seeing that everything was all right, as it is in evidence that to do so was included in his duties. That was the last seen of him alive. The train started east. After it had gone a short distance, a brakeman on the draw-bar of the last car discovered McAnnelly's dead body between the rails of the track over which the train had passed. The forward trucks of the box car next to the last in the train had jumped the track. The theory of the defendant in error was that McAnnelly was on the end

of the car under which were the trucks discovered to be off the track; that cinders and coal and rubbish which had accumulated on the track, over which the train was passing at the time McAnnelly was killed, caused the trucks to leave the track; that this caused an unusual and unexpected movement of the end of the car, or a jar or jolt, sufficient to and which did throw McAnnelly from the car and down between the cars to the track, where he passed under the cars and was dragged and crushed to death.

Whether there was sufficient evidence to warrant a finding of the jury that McAnnelly's death was caused substantially as indicated in the above statement, or sufficient evidence to justify the court in submitting some of the questions of fact to be determined in the case to the jury, are the questions mainly discussed and to be determined on the rehearing.   It must be borne in mind that the company did not introduce any testimony during the trial in the district court, but at the close of the testimony by plaintiff in that court, moved for an instruction to the jury to return a verdict for the company, and, upon overruling of the motion, did not introduce any testimony, and the case was submitted to the jury on the evidence adduced on behalf of the plaintiff in the lower court.   To reach a conclusion upon the inquiry now before us involves a close and careful examination of some portions of the testimony, and we can think of no better way than to quote it in substance or literally, more or less largely, as a thorough understanding of the part under discussion demands.

August Ericson, a watchman for the Omaha Packing Company, in the yards, stated that McAnnelly passed him where he was standing on a platform, attached to one of the packing houses, going east towards the engine, about five or ten minutes before his death; that the next time he saw him he was dead and his body lying between or on the middle of the tracks; that the cars had been pulled over him; that one car was off the track.

Charles L. Bowers, one of the switchmen of the crew handling the train, testifies that when he last saw McAnnelly alive, the morning of the 5th of February, 1890, he was repeating signals to the engineer, and when he next saw him he was lying between the tracks; and he was further questioned and answered in this connection as follows:

Q. What was his condition then?

A. Mangled and dead.

Q. Where were you when you discovered that he was between the tracks?

A. I was riding out, standing on the draw-bar of the rear car.

Q. How did you come to discover that he was on the track?

A. I seen a cap laying on the ground. I jumped off and lit right by the remains.    *    *    *

Q. Describe to the jury just how you found the deceased. Where was he lying in relation to the cars on the track?

A. He was lying with his head north, on his back, with his arm (right) under his back.

Q. Was he lying across the track or lengthwise?

A. With the track (indicating).

Q. What was the condition of the cars as to their being on or off the track?

A. There were the forward trucks of one car off the track.

Q. What kind of a car was that? Was it a box car?

A. Box car.

Q. Whereabouts was he lying as to being under the car or otherwise when you found him?

A. I don't understand you.

Q. Where was he lying with reference to the cars on the track; that is, was he under the car?

A. He just passed out here under the cars. The cars passed over him.

Q. Did the entire train pass over him?

A. Two cars, I believe.

Q. Well, had the last car of the train gone over him?

A. Yes, sir.   *   *   *

Q. You may state, Mr. Bowers, what the condition of the track was just immediately west, I believe, of where he lay.

A. Track was all full of cinders, rubbish, and things of that kind.

Q. Well, I will ask you now as to the condition of it just between the rails?

A. Pretty well filled up.

Q. You may state whether or not there were any marks there of any kind.

A. Don't understand you.

Q. I am asking you if you noticed where the cars left the tracks—trucks.

A. Yes, sir.

Q. How did you notice that fact?

A. From the prints of the cinders and rail, where they had crossed over the rail.

Q. What were the prints made by, do you know?

A. By the wheels of the cars.

Q. Now did you notice any other prints there?

A. Noticed the prints of the body where it had been trailing in the cinders.

Q. The point at which these marks, or impressions, between the rails commenced, how far was it west of where you found the body?

A. About thirty-six or eight feet.

Q. You may describe, Mr. Bowers, in your own way, the character of these marks between the rails, size, etc.

A. First mark I could discover was six or eight feet from where the car first left the track.

Q. In which direction?

A. East.   It looked like print in the cinders of a man's hip and shoulder.

Q. Go on and describe where you found the body.

A. Then it was mussed up and deeper in places.

Q. How far was this impression, if at all; that is, near to what rail?

A. It was near to the north rail.

Q. Just at the point where the car left the track, what was the condition of the track there in having impressions, etc., that you have testified about?

A. The impression—cinders and coal and rubbish was laying there.

Q. How far did these cinders, coal, and rubbish extend over the track; that is, what distance of the track did they cover east and west?

A. About four car lengths.

Q. What height were these cinders above the rails, if above them at all? (Withdrawn.)

Q. You may state how the cinders were piled on the track, and how high they were, with reference to the height of the rail.

A. They were kind'a in bunches. The height of the rail I could not state.

Q. What is that?

A. I could not tell how much higher than the rail they were, some places deeper than others.

On cross-examination he testified:

Q. Did the train move back at this time, or was it standing still?

A. Stood still for a short time.

Q. And when it moved, it moved toward the east?

A. Yes, sir.

And in re-direct examination:

Q. At the time you discovered that the truck was off, was the train made up and pulling out then?

A. Yes, sir.

Q. At that time did you know where the places of the switchmen and crew were as to being on the train, or off of it?

A. After things were all right, as a general thing two of us got on, me and the foreman, McAnnelly.

Q. What is that?

A. After we slack back and see that things are all right get on, as a usual thing.

Q. Yourself and McAnnelly?

A. Yes, sir.

Q. Where was Ferguson?

A. He was on already.

Q. And then would you accompany the train to where it was going?

A. Yes, sir.

Q. The whole crew?

A. Yes, sir.

And another witness, Don Martin Ferguson, a switch-man belonging to the crew, testifies that he saw McAnnelly probably five minutes before his death; that he was then walking up the north side of track No. 1 looking the train over; that he next saw him lying in the track, flat, and with the track lengthways and about a foot from the nearest rail; that one truck of one car at the east end was off the track; that the marks of where the wheel had run indicated where it had left the track. He further testifies to about the same condition of the track, as indeed do all the witnesses who saw it, as was testified to by Bowers. He also testifies that there was one mark between the rails which, from the appearance, he thought was made by McAnnelly's hip pressed in the dirt in the track, along to where they found the body; that this mark was first to be noticed about eight or ten feet east of where, from appearances, the wheels had left the track; that this mark continued from its point of commencement to where the body was found, about two car lengths, or sixty feet; that at this time they were "pulling out," had completed the train; that they were running three or four miles an hour; that probably two cars were backed over this place where the truck is

supposed to have left the track, when they backed in, and probably six or seven ran over it when they were pulling out; that the cinders were frozen that morning.

Albert W. Williams, who was a member of the coroner's jury which inquired into the cause of McAnnelly's death, testifies that, from the looks of the dirt there, the body had been dragged east down the track from some five or six feet from where the car had run off the track. He was asked this question:

Q. You have stated, I believe, you noticed where the wheels left the track?

A. Yes, sir.

Q. What indicated that, the marks?

A. I could see the mark where the wheel left the track and run on the ties.

The following is a portion of the testimony of one of the switchmen:

Q. The next time you saw Mr. McAnnelly at all, after the time when you—when he stood four feet from you, four feet north of you, repeating the signal you gave him, to the engineer, to give you the slack, was when you saw him lying on his back between the tracks?

A. Yes, sir.

Q. Between the rails of the track?

A. Yes, sir.

Q. Did you look and see whether there was any blood stains around there on the ties or on the rails?

A. I could not discover any. I looked.

Q. Didn't see any anywhere could you there?

A. No, sir.

The counsel for plaintiff in error, in an able brief and argument, strenuously contend that there was no evidence which even tends to prove that there was any negligence on the part of the company which was the proximate cause of the injury to plaintiff; that the verdict of the jury was predicated upon speculation and conjecture, and not upon

facts proved or admitted in the case, or inferences deduced from such proved or admitted facts.

We will now go back to what we have heretofore alluded to, viz., that the plaintiff in error did not introduce any testimony, but allowed the case to be submitted to the jury on the evidence on behalf of the plaintiff. The rule of the law in this state, on the subject of contributory negligence, as expressed in the case of *City of Lincoln v. Walker*, 18 Neb., 244, and *Anderson v. Chicago, B. & Q. R. Co.*, 35 Neb., 95, is as follows: " In an action for negligence, where the plaintiff can prove his case without disclosing any negligence on his part, contributory negligence is a matter of defense, the burden of proving it being on the defendant; " and the supreme court of Wisconsin has said that there being no witnesses as to how the death of a traveler at a railroad crossing occurred, deceased will be assumed to have been free from contributory negligence, where the circumstances and position in which he is found are as consistent with that presumption as with the presumption of contributory fault. (*Phillips v. Milwaukee & N. R. Co.*, 46 N. W. Rep. [Wis.], 543.) There was no evidence in the case which tends in the least degree to show any contributory negligence or any fault on the part of McAnnelly, and we must consider the case as to the other points and the different positions in which McAnnelly was placed by the evidence, bearing in mind that there is no contributory negligence. After a careful reading of the evidence we are convinced that there was a strong showing of the bad condition of the track, and sufficient evidence to submit to the jury and to sustain their finding as to what caused the trucks of the car to leave the track, and also of the knowledge on the part of the company, or lack of it, of this condition; and now we reach the main contention of the plaintiff in error, that there was no testimony to connect the occurrence of the death of McAnnelly with the negligence of the company.

44

In Sackett's Instructions to Juries, page 36, we find the following: "The jury are instructed that in determining what facts are proved in this case, they should carefully consider all the evidence given before them, with all the circumstances of the transaction in question as detailed by the witnesses, and they may find any fact to be proved which they think may be rightfully and reasonably inferred from the evidence given in the case, although there may be no direct testimony as to such fact," citing *Binns v. State*, 66 Ind., 428; and in Thompson, Trials, sec. 1039: "What inferences are to be drawn from the facts in evidence is, within reasonable limits, a question for the jury;" and again in section 1677: "In actions for damage for negligence the general rule is, within limits already indicated, that whether the damage which accrued to the plaintiff is the proximate or the remote result of the negligence of the defendant is a question of fact for the jury; that is to say, when doubt arises as to whether the damages are direct and proximate, or speculative and remote, the question should be submitted to the jury under proper instructions." In section 1678 of the same work is the following statement: "In an action for damages for negligence, where the evidence entirely fails to connect the negligence with the fact of the accident, the court should direct the jury that the plaintiff cannot recover; though in many cases the physical facts surrounding the accident will be such as to create a probability that the accident was the result of negligence, in which case the physical facts are themselves evidential, and furnish what the law terms evidence of negligence."

In *Bromly v. Birmingham M. R. Co.*, 11 So. Rep. [Ala.], 341, it was held: "Plaintiff's intestate, a brakeman on defendant's railroad, was killed by falling from a box car, in the top of which, near the brake, was a hole, according to some witnesses, four feet long, and according to others, four feet square. Deceased was last seen alive standing at the brake near this hole. Held, that there was evidence

for the jury to consider that the death of deceased was owing to the hole in the top of the car.  *   *   *  Where evidence is conflicting, or different inferences can be reasonably drawn from the evidence, or where there is any evidence tending to establish the case of the other side, the general affirmative charge should not be given in favor of either party."

In *Lillstrom v. Northern P. R. Co.*, 55 N. W. Rep. [Minn.], 624, the facts were as follows: "The facts as established on the trial were that, when living, the deceased resided with his family on a farm in a prairie country about one mile east of defendant's line of railway.  On the morning of February 18, 1890, Lillstrom, the intestate, left home with a pair of horses attached to bob sleighs to go several miles northwesterly for a load of wood, to obtain which he had to cross to the west side of said line of railway.  Leading in the direction he had to go was a generally traveled wagon road, which crossed the railway about five miles from his residence.  This road, at least where it crossed the track, was not a regularly laid out highway, but it, including the crossing, had been used by the public for several years.  Immediately after the railway was constructed, some five years before the accident in question, two farmers residing in the vicinity had prepared the crossing by digging the approaches, and by placing planking inside and outside the rails.  The defendant's section men took charge of the crossing at once, repaired the planking, replaced the same as needed, and otherwise kept the same in proper condition for travel as fully as if it had been a legally laid out or established highway.  The evidence was abundant upon this point, and also that the traveling public had very generally crossed the railway at this point while it had been maintained, preferring it to other crossings on either side.  The planking between the rails before mentioned had been kept in place continuously from the time it was first put in until about one month

prior to the day on which Lillstrom received his injuries,
and was then removed by defendant's section men to pre-
vent the accumulation of snow at that point, and thus fa-
cilitate the operation of the railway.   No sign was put up
or barriers erected to notify the traveler of this removal.
On the trial it was shown that Lillstrom in his lifetime
had used this crossing and when it was in good repair.  It
appears that he crossed at another place when going for the
wood, and it was not shown that he had been at this cross-
ing at all after the planks were taken up, until he was in-
jured.    The 19th of February was a stormy day.    About
4 P. M. a neighbor discovered Lillstrom lying upon the
ground, then covered with snow, at this crossing.    His
horses, attached to the bob sleighs with one trace only,
stood on the west side of the rails.    One single-tree was
broken.    Upon the sleighs was a heavy load of wood.  He
had evidently approached the place along the road from the
west (the railway running north and south), for the rear bob
stood west of the rails in the traveled track, while the forward
bob stood lengthwise and upon the rails, faced to the south.
Lillstrom lay across the rails in front of the forward bob.
He was conscious and said that he had broken his neck.
His injuries were such as to cause his death the following
day."    It was held: "In civil actions it is sufficient if the
evidence on the whole agrees with and supports the hy-
pothesis which it is adduced to prove, and it is the duty of
the jury to decide according to the reasonable probability
of the truth;" and in the text it is said: "It is further
contended by the defendant company, even if its neg-
ligence be established, that there was no testimony tending
to connect the accident which befell Lillstrom with such
negligence; in other words, that it was not shown that the
removal of the planks was the cause of his death.    We
have stated the circumstances under which he was found,
and undoubtedly the jurors came to the conclusion that
they were warranted in believing that, while Lillstrom

was attempting to cross defendant's track at the crossing
with a heavy load of wood upon his bob sleighs, the run-
ners of either the forward or the rear bob, or both to-
gether, struck the rails, which projected a few inches above
the snow, with such violence as to suddenly stop the horses,
cause one single-tree to break, three out of the four traces
to become detached, and to throw the forward bob at right
angles with the one in the rear, all concurring to precipi-
tate Lillstrom, who, as driver of the horses, would naturally
sit upon the top of the load of wood, with great force to
the ground, across the rails and in front of his sleighs,
where he was found so injured that he died the next day.
The facts as related upon the trial fully justified the jury
in believing that the accident happened in this way and
that the removal of the planking was the primary cause
of the injuries.   It was not necessary for plaintiff to show
by an eye-witness exactly how these injuries were received,
and that is really what was demanded by defendant's
counsel on the argument here.   It is not necessary in any
action, civil or criminal, that the material facts should be
established by direct evidence. In civil cases it is sufficient
if the evidence on the whole agrees with and supports the
hypothesis which it is adduced to prove, and it is the duty
of the jury to decide according to the reasonable probabil-
ity of the truth. (1 Greenleaf, Evidence [15th ed.], sec.
13a.)   There was no direct evidence as to the exact man-
ner in which Mr. Lillstrom was fatally injured, but there
were circumstances in evidence from which it may be
justly and fairly inferred that when the runners of his
sleigh struck the projecting rails, the shock was such as to
throw him upon and across the rails with great force and
violence.   If such be the fair and just inference to be de-
duced from the evidence, it was sufficient;" citing *Indian-
apolis, P. & C. R. Co. v. Collingwood*, 71 Ind., 476; *Indi-
anapolis, P. & C. R. Co. v. Thomas*, 84 Ind., 197; *Hays
v. Gallagher*, 72 Pa. St., 136.

. In the case of the *Omaha & Republican Valley R. Co.
v. Morgan,* 40 Neb., 604, it was held: "Issues as to the
existence of negligence and contributory negligence, and
as to the proximate cause of an injury, are for the jury to
determine, when the evidence as to the facts is conflicting
and where different minds might reasonably draw different
conclusions as to these questions from the facts established."

In the case at bar the last time McAnnelly was seen
alive by any of the witnesses he was about four feet from
the train and was apparently looking it over to see that
everything was all right as the train was then completed
or "made up," as the railroad men term it, and after it
stood for a short time, "pulled out." One witness says:
"After things were all right, as a general thing, two of us
got on, me and the foreman, McAnnelly, and after we slack
back and see that things are all right get on, as a usual
thing." Mr. Breckenridge: "Yourself and McAnnelly?"
"Yes, sir." Mr. Smythe: "And then you would accom-
pany the train to where it was going?" "Yes, sir." "The
whole crew?" "Yes, sir." It will doubtless be remem-
bered that there was testimony that at the time McAnnelly
was killed they were, as the witness stated it, "pulling
out." This fact of the usual custom of the crew when
they were "pulling out," coupled with the facts that Mc-
Annelly's body was discovered between the rails, stretched
out lengthwise and parallel with the rails, with a mark or
track, apparently made by the body, from a point at which
it would have fallen from the car, the forward trucks of
which were derailed, to the place where it was found;—that
the first evidences of the body being upon the track were,
as one witness expresses it: "First mark I could discover
was about six or eight feet from where the car left the
track." "In which direction?" "East. It looked like
print in the cinders of man's hip and shoulder;"—that
from here to where McAnnelly's body was found there was
a distinct mark, which, as all the witnesses testify, ap-

peared to be made by the hip and shoulder;—that there were no blood spots or marks, or indications of any kind or nature whatsoever, on either the rail or ties, that Mc-Annelly had been struck by the wheels; that the truck had been derailed and was running with one wheel on the ties on the outside of the rail, constitute an array of physical facts and set of circumstances which fully warranted the trial judge in submitting the case to the jury for their determination; and finding as the jury did, they would not be called upon, at any point in the case entering into such finding, to draw any inferences which would necessarily be violative of the rule of law which prescribes that "inferences must be drawn from facts proved;" nor do we think that the verdict rendered necessarily involved any speculation and conjecture, or other than reasonable and fair inferences in view of all the facts and circumstances proved on the trial as surrounding the killing of McAnnelly. The jury were well instructed as to their duty in the case and there was evidence sufficient to sustain the verdict rendered.

AFFIRMED.